United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**
No. 97-1155

United States of America,      *
                               *
            Appellee,          *
                               *      Appeal from the United States
       v.                      *      District Court for the
                               *      District of Minnesota.
S.A.,                          *
                               *
            Appellant.         *

_____

Submitted:  October 22, 1997

Filed:  November 17, 1997

_____

Before FAGG, WOLLMAN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

S.A., a federally adjudicated juvenile delinquent, appeals from an order of the district court[1] committing him to the custody of the United States Attorney General pursuant to 18 U.S.C. § 4246.  The district court found that S.A. suffers from a mental disease or defect and that, as a result, he poses a substantial risk of either bodily injury to another person or serious damage to the property of another.  The district court held, therefore, that civil commitment was warranted under section 4246.  S.A. raises two

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

issues on appeal. First, he asserts that the district court lacked subject matter jurisdiction because juvenile detainees are not subject to civil commitment under section 4246. Second, S.A. argues that, assuming that jurisdiction was proper, the district court erred in determining that he was mentally ill and dangerous. We affirm.

## I.

S.A., a Native American male, has an extensive history of psychological problems. In 1988, at the age of twelve, he was referred to Charter Hospital in Sioux Falls, South Dakota, after exhibiting signs of depression. One year later, S.A.'s mother placed him in McKennan Hospital in Sioux Falls after a suicidal incident involving a firearm. He was placed in McKennan again in 1990 following an overdose of prescription medication.

On August 24, 1992, S.A. was adjudicated a juvenile delinquent by the district court[2] after he set his brother's stereo on fire.[3] S.A. was placed on probation until the age of twenty-one. Nearly a year later, on August 11, 1993, the court found that S.A. had violated the terms of his probation and placed him in the custody of the Attorney General until the age of twenty-one.

S.A. has since been confined to various juvenile detention and mental health facilities. He has encountered problems at each, displaying poor behavior control and violent tendencies. In 1993, at the age of eighteen, S.A. was diagnosed as suffering from major depression with psychotic features. S.A.'s mental health problems peaked in 1995 while he was confined at the Lake Region Correction Center in Devil's Lake, North Dakota. At that time, he reported hearing voices and stated that he believed that there

---

[2]The Honorable John B. Jones, United States District Judge for the District of South Dakota.

[3]We note that S.A.'s conduct, had it been committed by an adult, would have constituted arson in violation of 18 U.S.C. §§ 1153 and 81.

were "beings out there trying to hurt him." Because of his severe psychological problems, S.A. was transferred from Devil's Lake to the Federal Medical Center in Rochester, Minnesota (FMC-Rochester).

S.A. arrived at FMC-Rochester in January of 1996. Because of his juvenile status he was placed in that facility's Special Housing Unit.[4] During his stay at FMC-Rochester, S.A. continued to experience serious psychological difficulties. He reported visual and auditory hallucinations that commanded him to act violently, and he requested to be placed on constant watch (suicide watch) on eight separate occasions. Dr. Mary Alice Conroy, a forensic psychologist with the Bureau of Prisons, treated S.A. at FMC-Rochester and diagnosed him as suffering from paranoid schizophrenia.

S.A. was scheduled for release from FMC-Rochester on April 24, 1996. In February of that year, upon Dr. Conroy's certification, the United States filed a petition to determine present mental condition of an imprisoned person due for release, pursuant to 18 U.S.C. § 4246. The petition alleged that S.A. was mentally ill and dangerous and sought to commit him indefinitely. S.A. moved to dismiss the petition, arguing that no jurisdiction existed under section 4246 to civilly commit a juvenile detainee due for release.

After conducting a hearing on the issue, the magistrate judge issued a report and recommendation, which concluded that section 4246 did not provide jurisdiction over juvenile detainees and recommended that S.A.'s motion to dismiss be granted. The district court rejected the recommendation and granted the government's petition on the merits.

---

[4]18 U.S.C. § 5039 prohibits juvenile offenders from being placed in the general prison population with adult prisoners.

## II.

S.A. first raises a matter of statutory interpretation. He argues that 18 U.S.C. § 4246, which provides for the civil commitment of offenders due for release, does not apply to individuals being held pursuant to the Juvenile Justice and Delinquency Prevention Act (hereinafter "Juvenile Act")[5]. We review this question of subject matter jurisdiction de novo. See Clarinda Home Health v. Shalala, 100 F.3d 526, 528 (8th Cir. 1996).

Our starting point in interpreting a statute is always the language of the statute itself. See United States v. Talley, 16 F.3d 972, 975 (8th Cir. 1994). If the plain language of the statute is unambiguous, that language is conclusive absent clear legislative intent to the contrary. See id. Therefore, if the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end. See Citicasters v. McCaskill, 89 F.3d 1350, 1354-55 (8th Cir. 1996). If, on the other hand, the language of a statute is ambiguous, we should consider "the purpose, the subject matter and the condition of affairs which led to its enactment." Lambur v. Yates, 148 F.2d 137, 139 (8th Cir. 1945). When the meaning of a statute is questionable, it should be given a sensible construction and construed to effectuate the underlying purposes of the law. See id.

The general statutory scheme setting forth the procedures for involuntary civil commitment of federal detainees is found at 18 U.S.C. §§ 4241-4247. Section 4246 provides for the indefinite hospitalization of a person who is due for release but who, as the result of a mental illness, poses a significant danger to the general public. See United States v. Steil, 916 F.2d 485, 487 (8th Cir. 1990) (citing United States v. Gold, 790 F.2d 235, 237 (2d Cir. 1986)). Under section 4246(a), the director of a facility housing a person "whose sentence is about to expire" may certify that the person suffers from "a

---

[5]The Juvenile Justice and Delinquency Prevention Act is codified at 18 U.S.C. §§ 5031-5042.

mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care . . . are not available." Upon the filing of such a certificate, the district court must hold a hearing to determine if the individual is mentally ill and dangerous. See id. If the court finds by clear and convincing evidence that the person is suffering from a mental disease or defect and that, as a result, his release would create a substantial risk of injury to persons or property, the court must commit the person to the custody of the Attorney General. See 18 U.S.C. § 4246(d).

S.A. contends that section 4246's reference to a "person whose sentence is about to expire" functions as an express limitation on the class of individuals subject to the statute. He argues that use of the word "sentence" limits the class of federal detainees subject to commitment to adult detainees serving criminal sentences. In view of his status as a juvenile offender, S.A.'s incarceration is considered a term of civil detention rather than a criminal sentence. Thus, S.A. argues, the district court has no authority to commit him under section 4246.

We are not convinced that the word "sentence" in section 4246 should be given such a restrictive interpretation. "Sentence," although most often used to define the period of confinement imposed for violation of a criminal statute, is also used in a much broader sense as a generic term to describe any term of detention, including those served by juveniles. The Juvenile Act itself employs "sentence" when referring to the period of confinement that a juvenile offender must serve. See 18 U.S.C. § 5038(f). Our cases also routinely use "sentence" to describe the period of confinement imposed upon federally adjudicated juvenile delinquents. See, e.g., United States v. Juvenile PWM, 121 F.3d 382, 383 (8th Cir. 1997); United States v. Crawford, 83 F.3d 964, 966 (8th Cir. 1996), cert. denied, 117 S. Ct. 258 (1996); United States v. Early, 77 F.3d 242, 244-45 (8th Cir. 1996); United States v. Allen, 64 F.3d 411, 413 (8th Cir. 1995). Moreover, the Federal Sentencing Guidelines refer to the detention of a juvenile as a "sentence" and permit the inclusion of a "juvenile sentence" in calculating a defendant's criminal history.

See U.S.S.G. § 4A1.2(d)(2). The word "sentence," as used in section 4246, thus encompasses more than simply criminal sentences being served by adult offenders.

S.A. also argues that if Congress had intended to include juveniles within the scope of section 4246, it would have done so expressly. In support of this contention, he cites provisions of the Juvenile Act in which Congress has expressly incorporated adult procedures. See, e.g., 18 U.S.C. § 5037(a) (release and detention provisions of Chapter 207 are to be applied in juvenile proceedings); 18 U.S.C. § 5037(b)(2) (probation provisions found at 18 U.S.C. §§ 3563-3565 are applicable in juvenile proceedings). As S.A. notes, neither the Juvenile Act (18 U.S.C. §§ 5031-5042) nor the statutory scheme for involuntary commitment (18 U.S.C. §§ 4241-4247) expressly provides that the involuntary commitment procedures are applicable to juveniles.

To hold that juveniles in federal custody are not subject to commitment under section 4246 would contradict the basic policy considerations that form the foundation of this provision. Under the federal involuntary commitment scheme, the district court is trusted with "an awesome responsibility to the public to ensure that a clinical patient's release is safe." United States v. Bilyk, 949 F.2d 259, 261 (8th Cir. 1991) (quoting United States v. Clark, 893 F.2d 1277, 1282 (11th Cir. 1990)). Section 4246 is specifically designed to avert the public danger likely to ensue from the release of mentally ill and dangerous detainees. See United States v. Moses, 106 F.3d 1273, 1280 (6th Cir. 1997). The statute is a mechanism intended to provide a safeguard to the general public and to ensure that mentally ill and dangerous individuals receive proper treatment. These concerns are not diminished merely because a detainee is a juvenile rather than an adult offender.

S.A. urges us to give credence to the general policy of federal abstention in the areas of juvenile law and civil commitment of the mentally ill. He argues that Congress intended for federal jurisdiction over juvenile matters to be extremely limited and that federal courts were not intended to deal with large numbers of juvenile offenders. Similarly, S.A. asserts that civil commitment of the mentally ill is traditionally a matter

of state concern and that the federal government's civil commitment authority is therefore quite narrow. Relying on this policy of abstention, S.A. suggests that section 4246 should be construed narrowly to exclude juveniles.

S.A. is correct in noting that federal authority in these areas is limited. Although federal jurisdiction over juvenile matters is generally the exception rather than the rule, it must be recognized that S.A. is already enmeshed in the federal system.[6] He has been adjudicated a juvenile delinquent by a federal court and is in the custody of the United States Attorney General. This is not a case, then, that presents the question of the initial involvement by the federal government in a matter of solely state or local concern. S.A. has been in federal confinement for a half decade now, not initially because of any mental problem, but because of his adjudication as a juvenile delinquent.

Our interpretation of section 4246 to include civil commitment authority over federally adjudicated juveniles does not infringe upon the right of states to civilly commit mentally ill individuals. By its own terms, section 4246 applies only in those unique situations where suitable arrangements for state care and custody are unavailable. As indicated above, to initiate commitment proceedings the director of the facility must certify that no suitable state arrangements are available. Even after an individual is committed to the custody of the Attorney General, section 4246(d) requires that the detainee must be released to the state of his domicile if that state will assume responsibility for his custody, care, and treatment.[7] Thus, civil commitment under section 4246 occurs "only in those rare circumstances where a person has no permanent

---

[6]Because S.A. was a Native American juvenile and because his conduct occurred on the reservation, federal jurisdiction was proper pursuant to 18 U.S.C. § 5032 and 18 U.S.C. § 1153.

[7]Indeed, after the district court granted the government's petition, the South Dakota Human Services Center in Yankton, South Dakota, agreed to accept S.A. for treatment. The record reveals that on January 3, 1997, the district court approved a conditional discharge of S.A. pursuant to 18 U.S.C. § 4246(e) and placed S.A. in the South Dakota Human Services Center for inpatient treatment.

residence or there are no State authorities willing to accept him for commitment." H.R. Rep. No. 98-1030, at 250 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3432.

The director of FMC-Rochester certified that suitable state arrangements were not available. S.A. did not challenge that assertion, but now suggests that reading section 4246 to include federal juvenile detainees would somehow infringe upon the states' civil commitment powers. We disagree. The civil commitment authority of a state is not infringed by a commitment which occurs when state facilities are unavailable. See Steil, 916 F.2d at 488 ("placement in an appropriate state institution . . . depends upon finding a state institution that is willing to accept [the detainee]").

## III.

S.A. also argues that the government failed to prove that he is mentally ill and dangerous, contending that the evidence does not support a finding that his release would create a substantial risk of injury to persons or property. In addition, he asserts that any level of dangerousness that might exist is not a "result of" his mental illness.

We have recognized that the government must satisfy a three-prong inquiry when seeking a civil commitment under 18 U.S.C. § 4246. See United States v. Ecker, 30 F.3d 966, 970 (8th Cir. 1994). The government must demonstrate: (1) a mental disease or defect; (2) dangerousness if released; and (3) the absence of suitable state placement. See id. S.A. concedes that he suffers from a mental illness or defect and does not dispute the unavailability of suitable state facilities. Thus, our only question for review is whether the district court erred in determining that S.A. is dangerous.

Section 4246(d) requires the government to prove dangerousness by clear and convincing evidence. See United States v. Evanoff, 10 F.3d 559, 560 (8th Cir. 1993). We review the district court's determination of dangerousness for clear error. See Ecker, 30 F.3d at 970; Evanoff, 10 F.3d at 560; Steil, 916 F.2d at 487.

We conclude that S.A.'s contention that the government failed to demonstrate that he is dangerous is without merit. As noted above, the record reveals that S.A. has a long history of violent and aggressive behavior and mental instability. During his stays at various juvenile correction facilities, he has repeatedly assaulted both staff members and other detainees and has shown a penchant for the destruction of property. S.A. experiences visual and auditory hallucinations, some of which urge him to act violently. He has reported that he is being "torn apart by demons" and that he hears voices which come from "the abyss." As recently as one week before the hearing, S.A. reported hearing such voices and stated a desire to "gouge his eyes out." S.A. also has an extensive history of drug and alcohol abuse. Furthermore, he wrote two letters while at FMC-Rochester professing his violent tendencies and threatening to commit future crimes.[8] Although medication is helpful in controlling S.A.'s condition, there is evidence that S.A. has shown a reluctance to continue medication on his own volition.[9]

Although S.A. argues that his recent behavior has been vastly improved, that fact alone does not require a finding that S.A. is not dangerous. See Evanoff, 10 F.3d at 563 ("the recency or remoteness of any particular activity simply affects the weight the court will give to that particular evidence"). Overt acts of violence are not required to demonstrate dangerousness. See Ecker, 30 F.3d at 970. Furthermore, S.A. has spent most of his time at FMC-Rochester in isolation and has therefore had minimal contact with others and, consequently, minimal opportunity to engage in violent behavior. The violent nature of S.A.'s visual and auditory hallucinations and his actual prior violent behavior are sufficient to support a finding that he is dangerous. See Steil, 916 F.2d at

---

[8]One of the letters, written in January of 1996 to a police detective, stated, "I am very violent and deserve incarceration to protect the people of the free world. Please give me my day in North Dakota Court or I will do another more serious crime with a gun to have my day in North Dakota Court, and I will do it. Arrest me now for assaulting with my fists or arrest me for assaulting with a firearm."

[9]S.A. complied with his medication regimen while in the structured atmosphere of FMC-Rochester, but admits past deviations from his prescriptions, stating that he often believed that he no longer needed the medication after his symptoms had disappeared.

487-88 (violent delusions and threats were sufficient to prove dangerousness even though detainee never had opportunity to act on them).  We conclude, therefore, that the district court did not commit clear error in finding that S.A. was dangerous.

Similarly, S.A.'s assertion that any dangerousness was not the "result of" his mental condition is meritless.  Although the record does not indicate that Dr. Conroy specifically stated that S.A.'s mental condition "caused" his violent behavior, she did state that S.A.'s dangerousness was "directly connected" with his mental illness and that his condition was a "significant factor" contributing to his violent behavior.  This testimony is more than sufficient to support a finding that S.A.'s dangerousness was a result of his mental condition.

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.