# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No.  01-3544
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Dorian Williams, | * | |
| | * | |
| Appellant. | * | |
| | * | |

_____

Submitted: June 14, 2002
Filed: August 5, 2002
_____

Before RILEY, BEAM, and MELLOY, Circuit Judges.
_____

MELLOY, Circuit Judge.

In 1998, a jury convicted Dorian Williams of four counts of threatening to murder a federal official and one count of threatening to murder a federal official's family.  Williams was sentenced to 46 months in prison and three years supervised release.  Prior to Williams' scheduled release date, the United States filed a petition seeking commitment under 18 U.S.C. § 4246 on the grounds that Williams was

mentally ill and dangerous. Following a hearing, the district court[1] granted the petition and committed Williams to the custody of the United States Attorney General for treatment and hospitalization. We affirm the order of the district court.

I.

Williams is currently 27 years old. His documented behavioral problems began at age 13 when his mother turned him over to the State of Missouri for out-of-home placement. He was in and out of boys' homes until age seventeen when he was permanently discharged after committing burglary in the second degree. Williams has admitted to four or five suicide attempts during his adolescence as well as a 40-day stay at an adolescent treatment facility. Aside from the burglary, Williams has state convictions for credit card fraud and trespassing.

Williams' interaction with the federal correctional system began in 1996 when he was convicted of impersonating a military officer. In that incident, Williams walked onto the U.S. Marine Corp Base at Lambert International Airport in St. Louis, Missouri, and attempted to requisition a truck after identifying himself as Captain Dorian Williams and presenting a military identification card. When the sergeant on duty concluded that the identification card was fraudulent, Williams was taken into custody. Williams pled guilty. After violating the terms of his supervised release, he was sent to the Federal Correctional Institution (FCI) in Milan, Michigan to serve the remaining eight months of his sentence.

---

[1] The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri, adopting the Report and Recommendation of The Honorable James C. England, United States Magistrate Judge for the Western District of Missouri.

Williams' placement at FCI-Milan was rocky. Dr. James R. Tabeling, a staff psychologist, characterized him initially as "quietly rageful" and noted his expressed desire for revenge against the individuals involved in his conviction. He perceived nearly all staff actions as insults and was repeatedly placed in disciplinary segregation for disobeying orders or refusing to work. One month into his sentence, Williams attempted suicide by hanging, after which he was placed briefly on suicide watch and ordered to attend counseling sessions. During these sessions, Williams reported that he was a professional speed cyclist and often discussed his dreams of continuing in this sport upon his release. Dr. Tabeling's records from this period note that Williams "has a very strong narcissism and stretches his perception of the world to meet his day dreams about himself." In September, 1997, Williams received thirty days disciplinary segregation after he was heard making threatening remarks about a prison education teacher. On October 8, 1997, Dr. Tabeling prepared a memo for the U.S. Marshals Service in which he noted Williams' difficulty controlling his rage when reality conflicted with the fantasy life he had created for himself. The memo concluded with the following:

> Another important element is the speed with which he changes the focus of his rage. I have no evidence to suggest that the judge, agent or halfway house staff are still in danger from this man. They have left his mental world. He is currently in segregation and expecting his release from prison. He feels he has mastered Milan federal prison. He sees himself as the master of his destiny. He is of course wrong and will most likely hurt the first person on the street that damages his view of himself.

One week later, on the day of Williams' release from FCI-Milan, a fellow inmate approached prison officials and reported that within the past few days Williams had spoken of killing the federal judge, the prosecutor, and FBI agent involved in his

-3-

case, as well as the prison teacher he had threatened. Williams apparently told the inmate of his plans to "blow the heads off" these individuals and then leave the country. The next day, Williams was arrested by federal marshals as he rode a bus to St. Louis. He was charged with four counts of threatening to murder a federal official and one count of threatening to murder a federal official's family. He remained detained until his jury trial whereby he was convicted on all counts. See United States v. Williams, 202 F.3d 271 (6th Cir. 2000) (table) (affirming conviction on appeal).

On October 1, 1998, Williams arrived at the FCI in Greenville, Illinois, to begin serving his 46 month sentence. According to the Psychology Services Intake Screening Summary, Williams presented at that time as alert and oriented, "but his disclosures were guarded." The record reflects that Williams' incarceration at FCI-Greenville was, for the most part, incident-free with only one significant period of disciplinary segregation after a fight with another inmate. In January 2001, however, prison officials seized from Williams' cell a list of bomb-making chemicals with page references to the Concise Chemical and Technical Dictionary. Throughout his incarceration, Williams continued to write letters to various people and entities regarding his affiliation with professional speed cycling organizations and his intention to break the world speed cycling record.

Shortly before his scheduled March 2001 release date, and in anticipation of the government filing the § 4246 petition, Williams was transferred to the Federal Medical Center at Springfield, Missouri, for diagnostic observation and evaluation. A Risk Assessment Panel concluded that Williams suffers from a delusional disorder and a personality disorder which create a significant risk of danger to others, particularly to the same federal judge and officials he had previously threatened. Williams' independent expert agreed that he has a personality disorder but found the existence of a delusional disorder "debatable." And although he could not completely rule out dangerousness, he felt the record did not support a finding that Williams' release posed a *substantial* risk of danger.

Following a hearing before the magistrate judge, at which the various experts and Williams testified, the magistrate judge recommended commitment. After a *de novo* review, the district court adopted the report and recommendation of the magistrate judge and committed Williams to the custody of the Attorney General.

II.

"Section 4246 provides for the indefinite hospitalization of a [federal prisoner] who is due for release but who, as the result of a mental illness, poses a significant danger to the general public." United States v. S.A., 129 F.3d 995, 998 (8th Cir. 1997) (citing United States v. Steil, 916 F.2d 485, 487 (8th Cir. 1990)). To warrant commitment under 18 U.S.C. § 4246, the government must demonstrate, by clear and convincing evidence: "(1) a mental disease or defect; (2) dangerousness if released; and (3) the absence of suitable state placement." Id. at 1000 (citing United States v. Ecker, 30 F.3d 966, 970 (8th Cir. 1994)). Additionally, the statute requires a direct causal nexus between the mental disease or defect and dangerousness. See id. (finding evidence sufficient to prove defendant's dangerousness was the "result of" his mental condition); United States v. Murdoch, 98 F.3d 472, 476 (9th Cir. 1996) ("If the person has dangerous propensities, but these propensities are not the result of a mental disease or defect, continued confinement is not justified . . ."). On appeal, Williams argues that the government failed to prove that he is mentally ill, that he poses a substantial risk of danger to others if released, and that the alleged risk of danger is the "result of" his mental illness.

We review the factual determinations underlying the district court's § 4246 decision for clear error. S.A., 129 F.3d at 1000; Ecker, 30 F.3d at 970; United States v. Bilyk, 949 F.2d 259, 261 (8th Cir. 1991). "[R]eview under the 'clearly erroneous' standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" Concrete Pipe & Prods. of Cal., Inc. v. Construction

Laborers Pension Trust, 508 U.S. 602, 623 (1993) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). We are not at liberty to substitute our view of the evidence for that of the district court merely because we would have reached a different conclusion. See Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).

Our close review of the record persuades us that the district court's findings were not clearly erroneous. Both sides' experts agreed that Williams suffers from a personality disorder with antisocial and narcissistic traits. The Risk Assessment Panel diagnosed, in addition, a delusional disorder of the grandiose type. Dr. William Grant concurred after conducting his own evaluation and record review for the government. In forming their conclusions, the government's experts cited Williams' behavioral and psychological history, particularly as evidenced by the clinical notes from FCI-Milan and his persistent grandiose belief in his cycling abilities. Dr. Kenneth Burstin, Williams' expert, opined that the record did not clearly support a finding of delusional disorder since Williams, when pressed, would recant his grandiose assertions. Dr. Grant testified, however, that Williams' ability to suppress his delusional belief system in order to minimize the likelihood of continued detention is not inconsistent with a delusional disorder diagnosis. Attempts to more thoroughly explore this issue through diagnostic testing and follow-up interviews were thwarted when Williams refused to cooperate. Given these facts, we find no error in the district court's conclusion that Williams suffers from a mental disease or defect. See Bilyk, 949 F.3d at 261 (affirming continued commitment order despite testifying experts' varying conclusions on issue of mental illness).

The district court's finding of dangerousness is equally supported by the record. Overt acts of violence are not required to prove dangerousness, S.A., 129 F.3d at 1001, and Williams' underlying convictions evidence the potential risk of danger resulting from his skewed perception that he has been intentionally wronged by specific individuals. See Ecker, 30 F.3d at 970 (citing Steil, 916 F.2d at 487-88, for

the proposition that "delusions and threats [are] enough to prove dangerousness even though defendant never had the opportunity to act on them"). Moreover, informant evidence presented by the government at Williams' § 4246 hearing, if credited, strongly suggests that Williams still harbors vengeful intentions toward these same individuals. See id. (including "identified potential targets" as major factor in dangerousness determination). See also Anderson, 470 U.S. at 575 (stating that factual findings based on witness credibility are accorded great deference on appeal); In re LeMaire, 898 F.2d 1346, 1356 (8th Cir. 1990) (citing Anderson, and noting, "[u]nder the clearly erroneous standard of review, we must pay special deference to the . . . court's credibility determinations"). Williams' apparent lack of hesitation to pass himself off as having military credentials heightens our concern on this point, as does the more recent incident in which a list of bomb-making chemicals was found in his cell. As to the latter, Williams' varied explanations for possession of the list are, to use his own expert's description, "less than clear and convincing." See Ecker, 30 F.3d at 970 (noting relevance of "any recent incidents manifesting dangerousness"); United States v. Sahhar, 917 F.2d 1197, 1207 (9th Cir. 1990) ("[A] finding of 'substantial risk' under [§] 4246 may be based on *any* activity that evinces a genuine possibility of future harm to persons or property.") (citing Jones v. United States, 463 U.S. 354, 364-65 (1983)).

Williams points to his minimal history of actual violence and his relatively problem-free incarceration at FCI-Greenville as evidence that he is not dangerous. These facts alone, however, do not refute the government's case. As noted above, overt acts of violence are not required for a dangerousness finding, and Williams' more recent behavior may merely reflect an adjustment to the strictly controlled correctional environment. See Murdoch, 98 F.3d at 476-77 (concluding that absence of violence while incarcerated was likely due to controlled environment of federal correctional facility); Steil, 916 F.2d at 487-88 (affirming dangerousness finding and noting absence of opportunity to act on delusions and threats while in prison). Certainly, periods of Williams' incarceration, as recounted at the hearing, were marked

by significant episodes of bizarre, defiant and explosive behavior. The experts, and the district court, were entitled to consider the risk of dangerousness in light of Williams' entire behavioral and psychological profile, not just its most recent manifestation. See Ecker, 30 F.3d at 970 (affirming dangerousness finding despite "the fact that [defendant's] last assault occurred over ten years ago, and that [defendant] had not assaulted anyone during his three years in confinement"); United States v. Evanoff, 10 F.3d 559, 563 (8th Cir. 1993) (stating that "the recency or remoteness of any particular activity simply affects the weight the court will give to that particular evidence"). In sum, despite Dr. Burstin's tentative opinion to the contrary, we find no clear error in the district court's determination that Williams' release would pose a substantial risk of danger to others. See Ecker, 30 F.3d at 970 (finding evidence sufficient to commit prisoner despite differences in expert opinions regarding dangerousness); Evanoff, 10 F.3d at 562-63 (same); Bilyk, 949 F.2d at 261 ("Given 'the trial judge's awesome responsibility to the public to ensure that a clinical patient's release is safe,' the district court may reject experts' conclusions when their reasoning supports different results." (internal citation omitted)).

Finally, we briefly address, and reject, Williams' "causal nexus" challenge. The testimony of the government's experts, consistent with the Risk Assessment Panel report, was sufficient to satisfy the plain language of § 4246. See S.A., 129 F.3d at 1001 (expert's testimony that defendant's dangerousness was "directly connected" with his mental illness was "more than sufficient" to support statute's causal nexus requirement). As we read the record, it is the combination of Williams' delusional disorder with his personality disorder that concerns the mental health experts in this case. As discussed throughout, we find this concern amply supported by the record and are further troubled by Williams' refusal to facilitate a thorough and reliable assessment of his mental health status. Under these circumstances, we cannot say that the government failed to present clear and convincing evidence that, if released, Williams poses a substantial risk of danger to persons or property as a result of his mental disease or defect. See Murdoch, 98 F.3d at 474, 477 (affirming continued

commitment where panel concluded that defendant's personality disorder with narcissistic and passive-aggressive traits "could affect his propensity to commit future acts of violence given the right circumstances" since defendant "could perceive future situations in a manner that would lead to similar dissociative episodes with possible violent acting out"); <u>United States v. Henley</u>, 8 F. Supp. 2d 503, 507 (E.D.N.C. 1998) (holding that "synergistic effect" of prisoner's severe antisocial personality disorder and severe borderline personality disorder would result in substantial risk of danger if prisoner was released because "his disorders, in combination, substantially impair his ability to function in society and control his behavior").

III.

Because we find no clear error in the district court's § 4246 findings, we affirm the district court's order committing Williams to the custody of the Attorney General for hospitalization and treatment. In so doing, we reaffirm an earlier observation that "'the government's role here is not that of punitive custodian of a fully competent inmate, but benign custodian of one legally committed to it for medical care and treatment – specifically for psychiatric treatment.'" <u>Steil</u>, 916 F.2d at 488 (quoting <u>United States v. Charters</u>, 863 F.2d 302, 312 (4th Cir. 1988)). In this respect, the Attorney General's statutory duties include a continued effort to place Williams in a suitable state facility, and to prepare annual reports concerning his mental condition and the need for his continued hospitalization. <u>See</u> <u>id.</u> (citations omitted).

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.