United States Court of Appeals

For the Eighth Circuit

_____

No. 20-2191

_____

United States of America

*Plaintiff - Appellee*

v.

Kevin Allen Dalasta

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: February 16, 2021
Filed: July 12, 2021

_____

Before SMITH, Chief Judge, ARNOLD and STRAS, Circuit Judges.

_____

SMITH, Chief Judge.

Kevin Allen Dalasta was charged with being a prohibited person in possession of a firearm. The district court[1] ordered that Dalasta be committed to the custody of

_____

[1]The Honorable M. Douglas Harpool, United States District Judge for the Western District of Missouri, adopting the report and recommendations of the

the Attorney General for mental health care pursuant to 18 U.S.C. § 4246. Dalasta argues that the district court clearly erred by concluding that he would be dangerous if released. We disagree and affirm.

## I. *Background*

In 2015, Dalasta's parents confronted Dalasta about the money he spent on cellphone games. The confrontation quickly escalated when Dalasta responded by packing his things (including firearms); threatening to leave; and holding a gun to his own chin. Ultimately, law enforcement responded, and no one was injured. But while investigating the situation, law enforcement discovered that Dalasta possessed firearms illegally.

The government charged Dalasta in the United States District Court for the Southern District of Iowa ("Iowa district court") with being a prohibited person in possession of a firearm. He was never tried, however, because the Iowa district court found Dalasta incompetent to proceed to trial. The Iowa district court then committed Dalasta to the custody of the Attorney General and ordered that he report to the United States Medical Center for Federal Prisoners (USMCFP) located in Springfield, Missouri, for a competency evaluation. After the evaluation was performed, the Iowa district court determined that Dalasta was unlikely to be restored to competency and ordered that he remain in the USMCFP for an evaluation of dangerousness under 18 U.S.C. § 4246(b).

The government then petitioned the United States District Court for the Western District of Missouri for a hearing on Dalasta's present mental condition under § 4246, requesting that he be committed. The magistrate judge held a hearing in August 2018. There, the government presented a report from a Risk Assessment

---

Honorable David P. Rush, United States Magistrate Judge for the Western District of Missouri.

Panel ("panel") comprised of USMCFP physicians. The panel report evaluated Dalasta's dangerousness. Panel member Dr. Robert Sarrazin, Chief of Psychiatry at USMCFP, and psychologist Dr. Ashley Christiansen, another USMCFP provider, testified at the hearing. Psychologist Dr. Richart DeMier, who Dalasta requested to independently evaluate him, testified as well.

Drs. Christiansen and Sarrazin, along with the panel, opined that Dalasta would be dangerous. Dr. DeMier, in contrast, opined that insufficient evidence existed to conclude that Dalasta was dangerous under § 4246. The magistrate judge issued a report and recommendation (R&R) recommending Dalasta's commitment. But the district court declined to make a ruling because over a year had passed since the panel's submission of its report.

Therefore, the government filed an updated risk assessment report, in which the panel again concluded that Dalasta presented a risk of dangerousness per § 4246. Dr. DeMier reevaluated Dalasta and submitted a new report, again opining that there was insufficient evidence for a finding of dangerousness. And the magistrate judge held another hearing at which Dr. Christiansen, Dr. DeMier, and Dan Dalasta (Dalasta's father) testified.

All of the experts agreed that Dalasta suffered from a permanent mental defect of a major neurocognitive disorder. While agreeing as to the presence of the defect, Dr. DeMier disagreed with Dr. Christiansen and the panel that Dalasta's defect presented a risk of harm to persons or property. The magistrate judge, however, concluded that Dr. Christiansen's and the panel's opinions were more persuasive. The magistrate judge noted that, "[f]irst, though not dispositive, the [g]overnment's medical experts . . . spent significantly more time evaluating [Dalasta] and . . . had more contact with [him] than Dr. DeMier." Appellant's Add. at 28. "Second, some of Dr. DeMier's findings convey[ed] uncertainty or change[d] over time, calling into question the basis for his conclusions." *Id.* Last, "and most compelling," the

magistrate judge found that, even though Dr. DeMier's ultimate opinion diverged from the other experts', Dr. DeMier's findings were generally "consistent with the [p]anel's, including that [Dalasta] suffers from a mental disorder that impairs his judgment, that the stressors of his environment can cause him to react disproportionately, that his increased false beliefs are concerning, that access to guns increases his risk, and that he will need life long care and supervision." *Id.* at 29.

The panel was specifically concerned about Dalasta's intent to possess firearms because Dalasta (1) could be emotionally reactive; (2) failed to understand that he was legally barred from possessing weapons; (3) had a "limited ability to accurately perceive situations," *id.* at 18; (4) repeated that it is was his right and intent to obtain firearms and use deadly force if threatened; and (5) confabulated "that he has a relationship with the U.S. military with high level security clearances and has extensive weapons training[] [and] that he was shot in the head during a covert CIA mission while engaged in combat in Panama," *id.* at 22.

Though Dr. DeMier ultimately opined that Dalasta would not be dangerous if released, he stated, "if [Dalasta] had ready access to weapons, that would have led me to a different conclusion." J.A. at 289. Dr. DeMier qualified his opinion with the assumption that Dalasta would live with his parents and not have access to guns. Thus, as the magistrate judge found, Dr. DeMier's "opinion relie[d] on assumptions about the conditions of [Dalasta's] environment upon release," which "Dr. DeMier c[ould not] guarantee or predict." Appellant's Add. at 31. Neither could the court guarantee Dalasta's environment, stating that upon release Dalasta "would effectively be free to live unsupervised, without any of the measures Dr. DeMier himself admits are necessary to decrease [Dalasta's] risk of future dangerousness." *Id.* at 32. Moreover, Dalasta "had adamantly expressed a desire to live on his own," which even Dr. DeMier "recognized." *Id.* at 26.

Based on the updated report, the magistrate judge once again recommended Dalasta's commitment in a second R&R. The magistrate judge based its recommendation upon Dalasta's

> lack of insight as to his mental defect and need to comply with treatment, his repeated intent to possess weapons and defend himself, his destructive behavior in flooding his cell, his lack of insight about possessing weapons, as well as the absence of a strong plan for release and supervision . . . .

*Id.* at 32. This time, the district court adopted the R&R and ordered that Dalasta be committed per § 4246.

## II. *Discussion*

Dalasta appeals the commitment order, challenging only the district court's finding of dangerousness. He argues that the district court clearly erred because it improperly (A) rejected Dr. DeMier's views on the basis that they lacked certainty; (B) shifted the burden of proof; and (C) discredited Dr. DeMier's opinion based on the government's experts' having spent more time evaluating Dalasta.[2]

Section 4246 allows for the "indefinite hospitalization" of Dalasta if he, "as the result of a mental illness, poses a significant danger to the general public." *United States v. Thomas*, 949 F.3d 1120, 1123 (8th Cir. 2020) (quoting *United States v. S.A.*, 129 F.3d 995, 998 (8th Cir. 1997)). Commitment under the statute requires the

---

[2]Dalasta also broadly argues that "[a] review of the record as a whole shows the lack of clear and convincing evidence as does the excerpts of this record." Appellant's Br. at 33 (citing pages 4–26 of his brief, which is the statement of facts). But it is not our job to make the appellant's arguments for him. *Cf. Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006). Dalasta has failed to develop this challenge. We therefore review only the specific arguments that he raised as set forth in Parts II(A)–(C) of this opinion.

government to prove that the person (1) has a mental disease or defect and (2) will be dangerous ("would create a substantial risk of bodily injury or serious property damage") if released. *Id.* In addition, the government must prove that there is "a direct causal nexus between the mental disease or defect and dangerousness" and that there is not a "suitable state placement." *Id.* (quoting *United States v. Williams*, 299 F.3d 673, 676 (8th Cir. 2002)).

The government has the burden "to prove dangerousness by clear and convincing evidence." *S.A.*, 129 F.3d at 1000. We then "review the district court's determination of dangerousness for clear error," *id.*, which is a "significantly deferential" standard, *Thomas*, 949 F.3d at 1123 (quoting *Williams*, 299 F.3d at 676). We will only reverse if we are left with "a 'definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Williams*, 299 F.3d at 676). Our ability to reach a different conclusion is insufficient grounds unless we are convinced the district court erred in reaching its decision. *Id.*

"Overt acts of violence are not required to demonstrate dangerousness." *S.A.*, 129 F.3d at 1001. "[D]elusions and threats [are] enough to prove dangerousness even though [the] defendant never had the opportunity to act on them." *Williams*, 299 F.3d at 677 (second alteration in original) (quoting *United States v. Ecker*, 30 F.3d 966, 970 (8th Cir. 1994)). The fact that a person's "recent behavior has been vastly improved," on its own, "does not require a finding that [the detainee] is not dangerous." *S.A.*, 129 F.3d at 1001 (citing *United States v. Evanoff*, 10 F.3d 559, 563 (8th Cir. 1993) ("[T]he recency or remoteness of any particular activity simply affects the weight the court will give to that particular evidence.")). Nor does that fact, coupled with a detainee's "minimal history of actual violence," require a finding that the detainee is not dangerous. *Williams*, 299 F.3d at 677. "A finding of substantial risk under § 4246 may be based on *any* activity that evinces a genuine possibility of future harm to persons or property." *Id.* (cleaned up).

## A. *Dr. DeMier's Opinion*

First, Dalasta argues that the district court improperly discounted Dr. DeMier by finding that Dr. DeMier's opinion "convey[ed] uncertainty or change over time." Appellant's Add. at 28. After careful review of the record, we disagree that the district court clearly erred in this finding. The district court supported its characterization of Dr. DeMier's opinion with examples in the record. Dalasta has not refuted the ability of those examples to provide a sound basis for the court's finding.

When assessing a person's dangerousness, the district court "may reject experts' conclusions when their reasoning supports different results." *Thomas*, 949 F.3d at 1124 (quoting *United States v. Bilyk*, 949 F.2d 259, 261 (8th Cir. 1991)). The district court has discretion to weigh the credibility and cogency of expert opinions. *See id.* Something more than disagreement with the court's credibility determination is needed to show that the court committed clear error. *See id.* Here, as in *Thomas*, "[t]he district court was unpersuaded by Dr. DeMier, and after careful review of the record, we are not left with a definite and firm conviction that a mistake has been committed." *Id.* (quotation omitted).

## B. *Dalasta's Access to Firearms*

Dalasta next contends that the district court required Dr. DeMier "to be clear, certain, and clairvoyant about [Dalasta's] lack of future dangerousness." Appellant's Br. at 33. He contends this elevated standard improperly shifted the burden of proof. We disagree with Dalasta's view of the court's ruling. The district court did not require Dalasta to prove, through Dr. DeMier, that Dalasta would not be dangerous.

All of the experts—including Dr. DeMier[3]—concluded that if Dalasta had access to firearms, he presented a risk to persons or property. Because Dalasta

---

[3]J.A. at 289 (Dr. DeMier reported, "if he had ready access to weapons, that would have led me to a different conclusion").

intended to possess firearms when released and live independently, the court concluded that there was sufficient proof of dangerousness. By stating that "Dr. DeMier cannot guarantee or predict that [Dalasta] would not have access to firearms," Appellant's Add. at 31, the district court correctly identified that Dr. DeMier's opinion rested on two assumptions unrelated to Dalasta's medical condition. Dr. DeMier assumed that Dalasta would live with his parents and not have access to firearms. These assumed conditions reduced the cogency of his opinion that Dalasta would not be dangerous because of the uncertainty of their eventuality. Again, the court was entitled to weigh Dr. DeMier's testimony with the other experts' opinions. *See Thomas*, 949 F.3d at 1124. It explained,

> the undersigned finds compelling Dr. Christiansen's and the [p]anel's opinion that [Dalasta's] continued belief about his need to possess weapons and use them if threatened elevates his risk. Dr. DeMier's opinion that [Dalasta's] assumed lack of access to firearms reduces his risk is less persuasive. Here, the charges leading to the present proceedings involved [Dalasta] being in possession of firearms he was not lawfully authorized to possess. Given that all the experts agree [Dalasta's] access to firearms increases his risk, the undersigned cannot ignore [Dalasta's] ability to access firearms would be entirely within his discretion if released.

Appellant's Add. at 32. Thus, by pointing out the weakness in an expert's opinion when contrasted against the opinions of other experts, the district court did not shift the burden of proof onto Dalasta.

## C. *Time Disparity*

Lastly, Dalasta argues that the district court erred by "discrediting Dr. DeMier's opinions by invoking the inherent time[]disparity between the [g]overnment experts and Dr. DeMier." Appellant's Br. at 36. However, Dalasta's argument is foreclosed by our decision in *Thomas*, 949 F.3d 1120.

-8-

In *Thomas*, the defendant argued that the district "court improperly gave more weight to the government experts simply because they spent more time with [the defendant]." 949 F.3d at 1123. There, we acknowledged that "if district courts can give government experts more weight simply because they have more time with the defendant, then the defendant will be disadvantaged." *Id.* at 1124. Even so, we explained that "the government's home-field advantage, by itself, is not grounds for clear-error reversal. Rather, a factfinder has authority to 'give properly admitted expert testimony such weight as he or she thinks the circumstances dictate that it deserves.'" *Id.* (quoting *Skar v. City of Lincoln*, 599 F.2d 253, 259 (8th Cir. 1979)). Thus, the inherent time disparity does not warrant reversal.

Moreover, the district court stated that the time disparity was "not dispositive" and, instead, found "most compelling" that Dr. DeMier's findings were largely consistent with the findings of the government's evaluators. Appellant's Add. at 28, 29; *cf. Thomas*, 949 F.3d at 1124 ("Moreover, the district court explained that the primary reason for ordering commitment was the weakness of Dr. DeMier's opinion, not the government's lengthy exposure to Thomas.").

### III. *Conclusion*

For the foregoing reasons, we affirm.

_____