# United States Court of Appeals
## For the First Circuit

No. 22-1597

UNITED STATES OF AMERICA,

Petitioner, Appellee,

v.

ANONYMOUS APPELLANT,[*]

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]
[Hon. Judith G. Dein, U.S. Magistrate Judge]

Before

Kayatta, Selya, and Rikelman,
Circuit Judges.

Christine DeMaso, Assistant Federal Public Defender, on brief for appellant.
Rachael S. Rollins, United States Attorney, and Michael L. Fitzgerald, Assistant United States Attorney, on brief for appellee.

---

[*] The record in this case is under seal. To preserve confidentiality interests, we have identified the appellant only as "Anonymous Appellant."

October 23, 2023

**SELYA**, <u>Circuit Judge</u>.   Congress has permitted the government to commit civilly an incarcerated person whose sentence is due to expire if that person suffers from mental illness that would cause him — if released — to pose a "substantial risk of bodily injury" to another individual or serious damage to property. 18 U.S.C. § 4246(d).   The Supreme Court has recognized, though, that "civil commitment for any purpose constitutes a significant deprivation of liberty."  <u>Addington</u> v. <u>Texas</u>, 441 U.S. 418, 425 (1979).   Balancing these interests requires courts to make specific findings, and we generally afford district courts a margin of deference with respect to such findings.

Against this backdrop, we are tasked in this instance with reviewing the district court's determination that Anonymous Appellant (AA) should be civilly committed upon the expiration of his prison sentence.   Although we are not unmindful of AA's advanced age and myriad health conditions, we nonetheless affirm.

**I**

We briefly rehearse the relevant facts and travel of the case.

**A**

AA, who is now seventy-three years old, has a lengthy history of incarceration spanning more than five decades.   As a juvenile, he was placed in a state reformatory for two years after

- 3 -

being adjudged guilty of involvement in a homicide.[1]  In 1976 — at age twenty-five — AA was convicted on a charge of distributing cocaine while in possession of a firearm.  The court sentenced him to serve a twenty-year term of immurement in a federal prison.  In 1983, AA was paroled.

While still on parole (in 1985), AA was involved in a drug dispute in which he fired a gun at an acquaintance and another individual.  He was convicted on charges of attempted murder, aggravated battery, and unauthorized possession of a firearm.  The court sentenced him to serve a forty-year term of immurement in a state prison.  AA remained in state custody until 2005.

While serving that sentence, AA began contacting a federal district judge, whom we shall call pseudonymously "Judge Doe."  AA had no relationship with Judge Doe, but he was under a delusion that they were married.

In 2005, AA was returned to federal prison for violating the parole conditions of his original federal sentence.  During this period of incarceration, AA began to exhibit psychotic symptoms.[2]  Antipsychotic medication was prescribed for him.  In

---

[1] The record does not contain any information about the underlying facts of this charge or the nature of AA's involvement. The district court concluded that the two-year placement in the state reformatory "seems to indicate that [AA's] 'involvement' was less than having actually committed the murder."

[2] Prison staff reported that AA had displayed some strange behavior while incarcerated as a young adult.  Later risk-

- 4 -

addition to his delusion about his marriage to Judge Doe, AA experienced a gallimaufry of other grandiose delusions (including that he was an emperor, that he had seven wives and 100 children, and that he owned a thriving geodesic homes business).

AA was paroled four times after 2005 — first in 2013, again in 2015, and twice in 2017. Each time, AA violated his parole conditions and was returned to custody.

- In 2013, AA sought to meet with Judge Doe, stopped taking his medication, and missed meetings with his probation officer.

- In 2015, AA absconded from the residential re-entry center to which he had been released.

- On both occasions in 2017, AA ignored instructions to refrain from contacting Judge Doe.

During a period of custody in 2015, AA was diagnosed as having schizoaffective disorder, bipolar type. In 2020, this diagnosis was augmented by a diagnosis that he also had antisocial personality disorder. The record indicates that schizoaffective disorder is characterized by delusions, hallucinations, and disorganized speech and behavior. Antisocial personality disorder is characterized by a lack of empathy, remorse, and respect for others' rights.

---

assessment panels were unable to determine if such behavior was an early sign of mental illness.

- 5 -

Although physicians prescribed antipsychotic medication for AA, he commonly refused to adhere to a medication plan. As such, his delusions often remain unrestrained. Given these delusions, AA was deemed incompetent to proceed with his 2015 parole hearing, and inpatient psychiatric treatment was ordered. Later that year — after a period of adherence to his medication regimen — AA was transferred to an open unit. At that point, though, his delusions and his behavior grew more troubling.

During his most recent periods of incarceration, AA was thrice evaluated by risk-assessment panels. In May of 2016, the first risk-assessment panel found that AA's condition had improved. But due to concerns about his delusional beliefs — particularly that he was in a relationship with a federal judge — the panel recommended that his release date be postponed to his April 2017 statutory release date.

In December of 2016, the second risk-assessment panel evaluated AA and declined to draw a clear connection between AA's previous instances of aggression or history of criminal activity and his mental disorders. Thus, AA was released from custody in February of 2017.

Shortly thereafter, AA violated his parole for the last time and was returned to prison. Following the resumption of custody in 2018, AA engaged in several acts of aggression directed toward other inmates and staff (described in greater detail infra).

Each time, his violent acts were fueled by delusional beliefs. As AA continued to refuse his medications, his psychotic symptoms worsened.

In 2020 — prior to the scheduled expiration of his federal sentence in May of that year — AA was evaluated by the third risk-assessment panel. When the panel asked AA if he planned to acquire a firearm when released, he responded affirmatively. He told the panel that he needed a firearm to protect his purported fortune and — when informed that he was not legally permitted to own a firearm — he replied, "Why should I care?" Additionally, AA indicated that he would not take medication when released, telling the panel flatly, "I don't need mental health services." The panel concluded that AA suffered from severe mental illness and, as a result, would pose a substantial risk of harm to persons and property if released.

**B**

Based on the concerns of the third risk-assessment panel, the government filed a petition in the district court for the civil commitment of AA pursuant to 18 U.S.C. § 4246. The district court referred the matter to a magistrate judge. See 28 U.S.C. § 636(b); Fed. R. Civ. P. 73(a). The magistrate judge proceeded to hold an evidentiary hearing. After considering all the evidence and evaluating the expert testimony, the magistrate judge issued a report and recommendation, in which she found that

AA was suffering from a mental illness, that the government had sufficiently established a link between AA's mental illness and his violent behavior, that there were no signs that his violent behavior had abated, and that AA's history supported a finding that he posed a substantial risk of bodily injury to another person. Given these findings, the magistrate judge recommended that the district court grant the government's petition for civil commitment. After considering the magistrate judge's findings and AA's objections, the district judge adopted the magistrate judge's report and recommendation, with only minor modifications. With that foundation in place, the district judge granted the petition for AA's civil commitment.[3]

This timely appeal followed.

## II

In this venue, AA challenges the district court's decision to grant the government's petition to have him civilly committed following the expiration of his prison sentence.

## A

We start with the standard of review. A district court's decision to commit an incarcerated person whose sentence is

---

[3] For simplicity's sake, we do not hereafter distinguish between the district judge and the magistrate judge but, rather, take an institutional view and refer to the determinations below as those of the district court.

expiring under 18 U.S.C. § 4246 is necessarily factbound and, thus, review is for clear error.  See United States v. Williams, 299 F.3d 673, 676 (8th Cir. 2002); United States v. Cox, 964 F.2d 1431, 1433 (4th Cir. 1992).[4]

## B

For the government to civilly commit a person under section 4246, the district court must find by clear and convincing evidence both that the person is suffering from a mental disease or illness and that his subsequent release would create a "substantial risk" of harm to another person or another person's property.  18 U.S.C. § 4246(d).  The clear and convincing standard is a demanding standard to satisfy.  See United States v. Volungus, 730 F.3d 40, 46 (1st Cir. 2013); see also Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 172 (2d Cir. 2000).

---

[4] AA suggests that our review should be for abuse of discretion.  Here, however, that would be a distinction without a difference.  The clear error hurdle is high:  when that standard applies, a reviewing court "ought not to upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, [it] form[s] a strong, unyielding belief that a mistake has been made."  Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990).  "The abuse of discretion standard is not monolithic but, rather, encompasses 'de novo review of abstract questions of law, clear error review of findings of fact, and deferential review of judgment calls.'"  United States v. Padilla-Galarza, 990 F.3d 60, 73 (1st Cir. 2021) (quoting United States v. Lewis, 517 F.3d 20, 24 (1st Cir. 2008) (footnote omitted)).  In this case, we are called upon to review a fact-sensitive determination as to whether AA — by reason of mental illness — poses a substantial risk to others.

What is more, the substantial risk must be a result of mental illness and not of unrelated propensities.[5] See id.

A finding of substantial risk may be premised on "any activity that evinces a genuine possibility of future harm." United States v. Sahhar, 917 F.2d 1197, 1207 (9th Cir. 1990) (emphasis in original). An inquiring court may consider a wide range of factors. These include "history of significant violent behavior, past compliance with medication protocols, drug or alcohol abuse, whether [the respondent] has named any targets of violent behavior, and his previous use of weapons." United States v. Mahoney, 53 F. Supp. 3d 401, 408 (D. Mass. 2014); see United States v. Ecker, 30 F.3d 966, 970 (8th Cir. 1994) (upholding finding of "substantial risk" based on factors such as respondent's history of violent behavior, history of carrying weapons, and lack of compliance with his medication regimen). A court may deem factors like the respondent's "lack of external environmental controls on release" and that there is "no assurance of compliance with treatment outside a structured setting" as weighing in favor of a finding of substantial risk. United States v. LeClair, 338 F.3d 882, 885 (8th Cir. 2003).

---

[5] The statute also requires the government to make "all reasonable efforts" to release a person to state custody before seeking civil commitment. 18 U.S.C. § 4246(d). Here, the government's efforts are not in issue: it is undisputed that, despite the government's efforts, AA's home state (Illinois) has refused to take custody of him.

The district court, in a thorough analysis, found that AA's violent behavior and delusional beliefs, coupled with the doubtfulness of his adherence to treatment recommendations, signal that — by reason of his mental illness — he posed a substantial risk to others if released. The parties do not quarrel over the material facts that the district court chronicled in its analysis. Nor do they dispute the district court's legal conclusions. Instead, they disagree as to whether the facts warrant a finding sufficient to justify AA's commitment under section 4246.

We discern no clear error in the district court's findings. Particularly when viewed in light of AA's criminal history, his repeated efforts to contact Judge Doe, his serial parole violations, and his seeming inability to stick to his medication regimen, his behavioral history firmly supports the district court's finding that — by reason of his mental illness — AA poses a substantial risk of harm to others.

To cinch the matter, AA has recently displayed a penchant for violent action driven by his delusional beliefs. While incarcerated in 2019, AA threatened his cellmate with a pencil based on the delusional belief that his cellmate intended to attack him with a razor. Then, in 2020, AA punched a different inmate in the face based on the false premise that the inmate had killed one of his non-existent wives. Finally, in 2021, AA attacked a nurse

without warning while in the thrall of the delusional belief that the nurse had poisoned or raped another of his non-existent wives.

AA's attempts to counter the district court's reasoning lack force. First, AA argues that the district court did not consider the effect his age and poor health would have on the likelihood of recidivism. But these facts were before the district court — and AA offers no plausible reason as to why we should second-guess the court's judgment that AA's physical limitations do not sufficiently negate the risk posed by his mental illness. Certainly, and as the district court concluded, AA's health and age would not prevent him from causing substantial harm if — as he has proclaimed his intent to do — he obtained a firearm.

Second, AA argues that his statement to the 2020 risk-assessment panel that he intended to obtain a firearm upon his release "d[id] not suggest that [he] was likely to get or use a gun when released" because his statement was rooted in the delusional belief that he had a multi-million-dollar business that he needed to protect. This argument is self-defeating: courts have recognized that delusions and threats are enough to prove dangerousness even though the respondent never had the opportunity to act on them. See United States v. Dalasta, 3 F.4th 1121, 1125 (8th Cir. 2021); Ecker, 30 F.3d at 970. Moreover, AA's recent violent episodes while incarcerated demonstrate that he has a

- 12 -

tendency to act on his delusional beliefs (however ungrounded they may be).

Next, AA attacks the methodology of his 2020 risk assessment. But even if we were to disregard that risk-assessment panel's determination, we agree with the district court that there is ample evidence in the record to support a finding that a substantial risk exists, attributable to AA's mental illness.

Battling on, AA argues that the district court erred in relying so heavily on altercations occurring while he was incarcerated because he "decompensated" in a prison setting. This argument gains him no traction. Although we recognize AA's past behavior while paroled was arguably nonviolent, his most recent conduct demonstrates a tendency to act on his delusions in a violent manner. And it is often "more difficult for a man who is in jail or confined to a mental hospital to translate his violent propensities into actual conduct than it is for a man who is free to act as he pleases." Warren v. Harvey, 632 F.2d 925, 934 (2d Cir. 1980). The district court reasonably could have concluded as much.

Last — but surely not least — AA argues that the district court erred in its overall assessment because the totality of the circumstances in his case do not support a finding that he posed a substantial risk. AA compares his case to that of the respondent in United States v. Smith, 964 F. Supp. 2d 167 (D. Mass. 2013).

- 13 -

There, the court declined to civilly commit a respondent who was schizophrenic and had been convicted of a violent crime but had not exhibited any violent tendencies in the past four years. See id. at 172-74. The court below appropriately distinguished Smith, noting that AA and Smith were not similarly situated because Smith had only one conviction for a crime of violence, had never been convicted of using a weapon, and had no violent conduct in the several years immediately preceding his scheduled release. See id. at 173-74.

We add a coda. There is no boilerplate set of facts that must be established in order to show that a substantial risk exists. Each case must be evaluated on its singular facts. We note, however, that our sister circuits have upheld the civil commitment of respondents based on evidence of violence comparable to that presented here. See, e.g., Dalasta, 3 F.4th at 1126 (affirming civil commitment for respondent who intended to acquire firearms if released); United States v. Steil, 916 F.2d 485, 487 (8th Cir. 1990) (affirming civil commitment for respondent who wrote threatening letters to public figures and "confused his hallucinations and delusions with the events around him"). We have said before — and today reaffirm — that we will not find clear error where "a body of evidence supports plausible but conflicting inferences," and the factfinder simply chooses between those

- 14 -

inferences.  <u>United States</u> v. <u>Wetmore</u>, 812 F.3d 245, 249 (1st Cir. 2016).  This is such a case.

### III

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**<u>Affirmed</u>**.