[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16442
Non-Argument Calendar

_____

D.C. Docket No. 1:13-cr-00018-TWT-JKL-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

PATRICK RANDELL MCINTOSH,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 20, 2018)

Before WILLIAM PRYOR, JILL PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

After Patrick McIntosh was found not guilty by reason of insanity of unlawfully possessing firearms while under felony indictment, threatening the President of the United States, threatening law enforcement, and making threats by interstate communication, the district court ordered him civilly committed under 18 U.S.C. § 4243(f).  McIntosh seeks review of the district court's decision to deny him unconditional release from civil commitment.  McIntosh does not contest the district court's findings that his underlying crimes involved a substantial risk of bodily injury to another and that there was a substantial risk that McIntosh would harm others in the future.  He argues instead that the district court erred in finding that the government could continue to hold him under the civil commitment statute because his risk of danger to others was due to a "mental disease or defect." 18 U.S.C. § 4243(d).  After careful review, we conclude that the district court did not clearly err in finding that McIntosh's risk of danger to others was due to a mental disease or defect given the evidence that he suffered from a particularly severe personality disorder.  We affirm.

## I.    BACKGROUND

A federal grand jury charged McIntosh with unlawful possession of firearms while under felony indictment, threatening the life of the President of the United States, threatening federal law enforcement officers, and making threats by interstate communications.  In a bench trial, the district court found McIntosh not

guilty by reason of insanity on all four counts and ordered him civilly committed. The district court committed McIntosh to a mental health facility within the Bureau of Prisons. After McIntosh had been committed for nine months, the district court held a hearing in which the court determined that McIntosh failed to meet his burden to show that his release would not constitute a danger to the community due to his present mental illness. The district court committed McIntosh to the Attorney General's custody until he no longer posed a danger to the community due to his mental disease or defect. *See* 18 U.S.C. § 4243(e).

## A.    Underlying Offense Conduct

In August 2012, McIntosh posted on his Facebook page, "I wanna kill the President." Doc. 167 at 3.[1]  Shortly after, he purchased a 12-gauge shotgun and a .22 caliber pistol. Law enforcement officers later discovered the firearms and ammunition in McIntosh's hotel room. At the time that law enforcement found the firearms and ammunition, McIntosh had pending charges in South Carolina after being indicted for the felony offense of stalking. A federal grand jury indicted McIntosh on charges of unlawful possession of firearms while under felony indictment, in violation of 18 U.S.C. § 922(n) (Count One), and making a threat to take the life of the President of the United States, in violation of 18 U.S.C. § 871 (Count Two).

---

[1] "Doc. #" refers to the numbered entry on the district court's docket.

3

While incarcerated pending trial, McIntosh threatened, via phone calls and emails to his mother, the law enforcement officials who investigated and were prosecuting his case. During one phone call, he said, "I'm going to end up committing murder. 'Cause I'm that—I'm that angry. I'm that angry to kill an FBI agent. I'm that angry to kill a prosecutor. I'm that angry." Doc. 167 at 3. In an email with "hit list" as the subject, he listed the names of the Assistant United States Attorney who was prosecuting his case, the federal air marshal working with the FBI who investigated the case, an ex-girlfriend, and his father. *Id.* While incarcerated in Georgia, McIntosh sent these communications to his mother in South Carolina.

Based on these further threats, McIntosh was indicted on additional charges of making threats to law enforcement, in violation of 18 U.S.C. § 115(a)(1)(B) (Count Three), and making threats by interstate communication, in violation of 18 U.S.C. § 875(c) (Count Four).

## B.    McIntosh's Notice of His Insanity Defense

After pleading not guilty, McIntosh notified the government that he intended to raise an insanity defense and to introduce expert evidence relating to a mental disease or defect bearing on the issue of guilt. *See* Fed. R. Crim. Pro. 12.2.[2]

---

[2] Federal Rule of Criminal Procedure 12.2 requires a defendant who intends to assert a defense that he was insane at the time of the alleged offense or who intends to introduce expert evidence relating to a mental disease or defect bearing on an issue of guilt to notify an attorney

4

McIntosh was examined by Dr. Michael Hilton, an expert for the government, and Dr. Julie Dorney, an expert for the defendant, who offered opinions about, among other things, whether McIntosh was able to appreciate the nature and quality or wrongfulness of his acts.[3]

Dr. Hilton concluded that McIntosh did not suffer from a mental disease or defect making him unable to appreciate the nature and quality or wrongfulness of his acts. Dr. Hilton noted, however, McIntosh's problems with loss of temper, annoyance, anger, suspiciousness, and resentfulness, as well as his tendencies towards argumentativeness with authority figures, defiance of authority, and vindictiveness. Dr. Hilton indicated that McIntosh saw himself as someone who could become a serial killer and had thought about how he would commit such crimes by choking or starving his victims. Dr. Hilton also noted that McIntosh created a list of individuals whom he has considered killing.

Dr. Dorney diagnosed McIntosh with Bipolar Disorder, a mental disease that made McIntosh unable to fully appreciate the wrongfulness of his acts at the time of the offenses. Dr. Dorney determined that McIntosh's Bipolar Disorder

---

for the government in writing within the time provided for filing a pretrial motion and file a copy of the notice with the clerk of court.

[3] To be found not guilty by reason of insanity, a defendant must prove that at the time of the commission of the acts constituting the offense, he, "as a result of severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). The defendant bears the burden of proving this affirmative defense by clear and convincing evidence. *Id.* § 17(b).

manifested in his mood, agitation and threatening behavior; paranoid delusional thinking; impulsivity; grandiosity; high levels of energy; and disinhibition. Dr. Dorney found that McIntosh suffered from paranoid delusional thinking that the FBI, a local sheriff's department, his previous mental health providers, and his father were conspiring together to kill him. Dr. Dorney further diagnosed McIntosh with features of Narcissistic, Borderline, and Antisocial Personality Disorder expressed in his impulsivity, unlawful behavior, recurrent thoughts of self-harm, lack of empathy, and poor judgment. Although Dr. Hilton and Dr. Dorney disagreed on the availability of the insanity defense for McIntosh, both experts determined that he was competent to stand trial. After these evaluations were completed, the case proceeded to a bench trial.

## C.    The Evidence at Trial

The bench trial focused on two issues:  whether McIntosh was guilty of committing the offenses charged in the indictment and, if he was, whether he should be found not guilty by reason of insanity. Because insanity is an affirmative defense, the government first had to prove that McIntosh committed the offenses in question before he could be acquitted due to a mental disease or defect.

At trial, McIntosh argued that the government's evidence was insufficient to prove beyond a reasonable doubt that he committed the offenses. But the

6

government introduced evidence showing that he had possessed a firearm while under felony indictment and made statements threatening the President, government officials, and others. As to Count One, McIntosh stipulated that he had purchased and received a shotgun and pistol while under a pending felony indictment in South Carolina for stalking.

As to Count Two, McIntosh stipulated that he wrote he wanted to kill the President. McIntosh also wrote in letters that "[he] meant every word of it" and that "he wanted to hurt the President of the United States as 'a conveyance of a desire.'" Doc. 167 at 3. On Count Three, the government played recordings of phone calls in which McIntosh told his mother that he would kill the government officials who were prosecuting his case or investigating him. McIntosh also stipulated that he sent his mother an email with the subject line "hit list" that contained the same officials' names. As to Count Four, the government played recordings of phone calls in which McIntosh threatened to beat and stab his father and an ex-girlfriend. As stipulated, McIntosh made these phone calls while incarcerated in Georgia to his mother, who lived in South Carolina.

McIntosh argued at trial in the alternative that even if he committed the offenses, he should be found not guilty by reason of insanity. In support, he introduced medical evidence, including the opinion of Dr. Dorney. McIntosh also called his mother, Mary Celeste Conlon, to testify. Conlon described McIntosh's

7

history of treatment for mental illness, which included involuntary commitments, and his behavioral difficulties. Conlon stated that in previous mental health assessments McIntosh had been diagnosed as bipolar. Conlon also explained that she had many interactions with law enforcement regarding McIntosh's mental health condition. At the end of her testimony, Conlon requested that McIntosh receive long term mental health assistance. Other evidence at trial showed that Conlon was afraid of McIntosh and had added reinforced doors and windows to her home to protect herself from his erratic behavior.

Although the government's expert, Dr. Hilton, concluded that McIntosh was suffering from no mental disease or defect making him unable to appreciate the nature and quality or wrongfulness of his acts, at trial the government did not contest that McIntosh was not guilty by reason of insanity. At the conclusion of the bench trial, the district found that the government had proven beyond a reasonable doubt that McIntosh had committed the four charged offenses. The district court then determined that McIntosh committed the offenses while suffering from a mental disease or disability and judged him not guilty by reason of insanity.

**D.     Risk Assessment Panel Report**

After finding McIntosh not guilty by reason of insanity, the district court ordered him committed to a mental health facility to undergo a psychiatric

8

evaluation.  McIntosh was then evaluated over a period of four months by a risk assessment panel, consisting of a psychologist, a psychiatrist, and a licensed social worker.  After a psychologist evaluated McIntosh, the panel prepared a Risk Assessment Report (the "Report") addressing whether McIntosh's release from custody would present a substantial risk of injury to others as a result of a present mental disease or defect.

In the Report, the panel diagnosed McIntosh with Narcissistic Personality Disorder with Borderline, Histrionic, and Antisocial traits and opined that he suffered from a severe case of this personality disorder.  The panel noted that McIntosh exhibited patterns of behavior that were characterized by grandiosity, lack of empathy, significant entitlement, arrogance, impulsivity, anger, irritability, and attention seeking.  The panel concluded that due to his severe personality disorder McIntosh had difficulty behaving in accordance with societal expectations regarding lawful behavior and also engaged in a pattern of reckless and impulsive behavior indicative of a disregard for the safety of others.

The panel further found that McIntosh was at a high risk for engaging in future violent behavior.  He had experienced behavioral difficulties since age 12, including engaging in aggressive behaviors such as fighting, domestic violence, and making racist comments.  In addition, McIntosh had continued to make specific and lethal threats toward others throughout the period when he was being

evaluated.  The Report noted that the risk of McIntosh engaging in violence in the future was enhanced by his lack of insight and lack of amenability to treatment, as well as his refusal to accept responsibility, lack of social support, and unrealistic future plans.

The Report concluded that if the district court found that a personality disorder could legally constitute a mental disease or defect, then McIntosh presented a risk to others due to a mental disease or defect.  Conversely, the Report concluded that if the district court determined that a personality disorder could not legally constitute a mental disease or defect, then McIntosh would not present a risk to others based on a mental disease or defect.

## E.    The 18 U.S.C. § 4243 Hearing

After the panel issued the Report, the district court held a hearing to determine whether McIntosh should be released.  At the hearing, the district court reviewed the Report and heard testimony from the psychologist who had evaluated McIntosh.

The psychologist testified that during the assessment period McIntosh repeatedly stated that he wanted to kill his father, his ex-girlfriend, state and federal prosecutors, FBI investigators, and anyone else who had "screwed him over" and provided detailed descriptions of how he would do so.  Doc. 215 at 25. McIntosh made these statements between five and ten times and explained that

using a firearm to kill his victims "would not be personal enough." *Id*. When asked how certain he was that he would harm others, McIntosh stated that he was "ten out of ten" certain that he would harm people. *Id*. at 36. The psychologist further testified that while being evaluated McIntosh had assaulted another inmate who had called him a "know-it-all." *Id*. at 26. The psychologist also testified that McIntosh exhibited the same behaviors during the assessment period that he had exhibited when he committed the criminal offenses.

At the conclusion of the hearing, the district court found the evidence overwhelmingly proved that McIntosh posed a substantial risk of bodily injury to others. The district court adopted as findings of fact the contents of the Report and the psychologist's testimony in their entirety, meaning the court found that McIntosh suffered from Narcissistic Personality Disorder with Borderline, Histrionic, and Antisocial traits. The district court further noted that McIntosh had a history of demonstrating antisocial behavior, which was characterized by a pervasive pattern of disregard for and violation of others' rights. The court also relied on the fact that McIntosh repeatedly made  assertions that he wanted to kill his father, an ex-girlfriend, FBI agents, and state and federal prosecutors, as well as that he intended to own firearms and harm multiple people.

As to whether McIntosh was suffering from a mental disease or defect, the district court found that McIntosh had failed to meet his burden to show that his

11

risk of danger to others was not due to a present mental disease or defect. The court accepted the diagnosis that McIntosh suffered from a severe personality disorder resulting in "significant difficulty in functioning within society's expectations and impair[ing] his functioning in many areas." Doc. 206 at 3. The court found that McIntosh's personality disorder manifested itself with affective problems, including inappropriately intense anger, impulsivity, and a pervasive pattern of disregard for and violation of the rights of others. The court also found that McIntosh's personality disorder was severe enough to constitute a mental disease or defect. In making this finding, the court relied upon a definition of a mental disease or defect as "any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." *See McDonald v. United States*, 312 F.2d 847, 851 (D.C. Cir. 1962).[4] The district court ordered McIntosh committed pursuant to 18 U.S.C. § 4243(e).

## II.    STANDARD OF REVIEW

Whether a person is suffering from a mental disease or defect under § 4243 presents a question of fact, subject to a clearly erroneous standard of review. *See United States v. Wattleton*, 296 F.3d 1184, 1201 n.34 (11th Cir. 2002). "[R]eview

---

[4] The district court noted that "case law consistently indicates that labels applied by clinicians are not necessarily controlling to determine whether the defendant is suffering from a mental disease or defect, but rather the determination is a question of fact." Doc. 206 at 2-3.

under the 'clearly erroneous' standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" *Concrete Pipe & Prods. of Cal. v. Const. Laborers Pension Tr.*, 508 U.S. 602, 623 (1993).  If the district court's findings are "plausible in light of the record viewed in its entirely," we may not reverse the findings simply because we "would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

## III.    THE CIVIL COMMITMENT STATUTORY SCHEME

Before examining the merits of McIntosh's claim, we pause to provide an overview of the civil commitment statutory scheme.  Under 18 U.S.C. § 4243, a defendant found not guilty by reason of insanity of a federal crime is committed to a suitable facility pending a hearing to determine whether he is eligible for release.  Before this "dangerousness" hearing, a court-ordered psychiatric or psychological examination of the insanity acquittee is performed, and a report based on that examination is filed with the court.  *See* 18 U.S.C §§ 4243(b), 4247(b)-(c).  The court must hold a hearing within 40 days of the insanity verdict to ensure that the insanity acquittee's release "would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental

disease or defect."[5] *Id.* § 4243(c), (d).  Although the dangerousness hearing is a

civil proceeding, the insanity acquittee has a right to counsel at the hearing.  *Id.*

§ 4247(d).  The insanity acquittee must be "afforded an opportunity to testify, to

present evidence, to subpoena witnesses on his behalf, and to confront and cross-

examine witnesses who appear at the hearing."  *Id.*

The insanity acquittee's burden of proof at the hearing depends on the nature

of the underlying offense.  If he was found not guilty by reason of insanity of an

offense involving bodily injury, serious damage to another's property, or

substantial risk of such injury or damage, he must prove by "clear and convincing

evidence that his release would not create a substantial risk of bodily injury to

another person or serious damage of property of another due to a present mental

disease or defect."  *Id.* § 4243(d).  With respect to any other offense, his burden of

proof is a preponderance of the evidence.  *Id.*  Here, because at least some of his

underlying offenses involved a substantial risk of bodily injury, McIntosh could be

released only if he proved by clear and convincing evidence that his release would

not create a substantial risk.

If an insanity acquittee fails to meet his burden of proof, the court must

commit him to the custody of the Attorney General of the United States, who

arranges for his care and treatment.  *See* 18 U.S.C. §§ 4243(e), 4247(i).  The

___

[5] Although the statute requires the hearing to be held within 40 days of the verdict, McIntosh consented to extend the assessment period.

14

Attorney General will release the insanity acquittee when he has recovered from his mental disease to such an extent that his release, or his conditional release under prescribed care, would no longer create a substantial risk of bodily injury to another person.  *See id.* at § 4243(f).

## IV.   DISCUSSION

McIntosh argues that the district court erred in committing him because there was no evidence that he suffered from a present mental disease or defect.  He contends that his diagnosis of severe Narcissistic Personality Disorder with Borderline, Histrionic, and Antisocial traits does not qualify as a mental disease or defect for purpose of § 4243.  He supports his argument with statements from the Report and the psychologist's testimony that personality disorders are not "typically" considered mental diseases or defects.  McIntosh contends that the phrase mental disease or defect in the statute must be limited to those diagnoses that *clinicians* would classify as mental diseases or defects.  We disagree.

Section 4243 does not define the phrase "mental disease or defect."  *See* 18 U.S.C. § 4243(d).  But we are persuaded to adopt the definition established by the D.C. Circuit in *McDonald v. United States*, 312 F.2d 847 (D.C. Cir. 1962).  In *McDonald*, the court defined mental disease or defect as "any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls."  *Id*. at 851.  The court explained that

15

"[w]hat psychiatrists may consider a 'mental disease or defect' for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the [court's] purpose in determining criminal responsibility." *Id*. We agree that the phrase mental disease or defect is a legal term that must be construed and applied by the district court to the specific facts of each case, rather than a clinical term to be decided by medical professionals. *See also United States v. Weed*, 389 F.3d 1060, 1072-73 (10th Cir. 2004) (holding that the insanity acquittee qualified under the law as having a mental disease or defect, despite not meeting clinical criteria for mental illness); *United States v. Murdoch*, 98 F.3d 472, 478 (9th Cir. 1996) (Wilson, J., concurring) (explaining that a personality defect in certain circumstances may be "so encompassing and impairing that it rises to the level of a disease or defect"); *United States v. Lyons*, 731 F.2d 243, 246 (5th Cir. 1984) ("[W]hat definition of 'mental disease or defect' is to be employed by courts enforcing the criminal law is, in the final analysis, a question of legal, moral and policy—not of medical—judgment.").

Consistent with the decisions of our sister circuits, we conclude that a personality disorder may qualify as a mental disease or defect under § 4243. The Eighth Circuit has held that a personality disorder can constitute a mental disease or defect even if medical professionals disagree. In *United States v. Bilyk*, 949 F.2d 259, 261 (8th Cir. 1991), two of three medical experts determined that the

16

insanity acquittee did not suffer from a mental disease or defect, but all three agreed that the defendant suffered from a personality disorder. *Id.* at 260-261. The Eighth Circuit concluded that from this evidence the district court could find the defendant suffered from a "mental defect" for purposes of § 4243. *Id.* at 261. We agree with *Bilyk* and other courts that a personality disorder may constitute a mental disease or defect depending on the severity, symptoms, and resulting impairment—all of which are factual determinations for the district court. *See United States v. Beatty*, 642 F.3d 514, 516 (6th Cir. 2011) (recognizing that antisocial personality disorder could potentially "form part of the basis for civil commitment"); *United States v. Williams*, 299 F.3d 673, 678 (8th Cir. 2002) (affirming finding that prisoner suffering from a personality disorder was dangerous due to a mental disease or defect); *Murdoch*, 98 F.3d at 476 (accepting that individual with a personality disorder suffered from a mental disease or defect).

Given the record evidence about the severity and symptoms of McIntosh's personality disorder, as well as his resulting impairments, the district court did not clearly err in finding that he suffered from a mental disease or defect under § 4243. The risk assessment panel concluded that McIntosh suffered from a *severe* form of Narcissistic Personality Disorder with Borderline, Histrionic, and Antisocial traits. McIntosh also exhibited significant symptoms from his personality disorder that

17

resulted in maladaptive behaviors.  The psychologist testified about the serious symptoms that McIntosh displayed during the four months while he was being evaluated, including increased impulsivity and inappropriately intense anger that led to a pervasive pattern of violating the rights of others.  The evidence further showed that McIntosh suffered severe impairments that manifested in his perceptions of the world, emotional responses, interpersonal functioning, and impulse control.

The district court also did not clearly err in finding that McIntosh's dangerousness was due to his mental disease or defect.  The evidence showed that McIntosh's personality disorder increased the risk that he would pose a danger to others.  The Report explained that McIntosh's personality disorder contributed to his intense anger and instability.  And the evidence reflected that McIntosh continued to pose a threat of harming others as he continued to make repeated threats throughout the evaluation period, exhibiting the same behavior as when he committed the criminal offenses.  Indeed, McIntosh stated that he was "ten out of ten" certain that he would harm people.  Doc. 215 at 36.  And the psychologist opined that if McIntosh obtained access to those persons, he likely would act on his homicidal ideations.  We thus conclude that the evidence supported that McIntosh posed a high risk of engaging in future violence due to his severe and pervasive personality disorder.

18

## V.    CONCLUSION

McIntosh has failed to demonstrate that the district court clearly erred in finding he suffered from a mental disease or defect and that his dangerousness was due to his mental disease or defect.  We therefore affirm the district court's order of commitment.[6]

**AFFIRMED.**

---

[6] Also pending before the Court is McIntosh's motion for appointment of new counsel. That motion is DENIED.