**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-13343

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JOSHUA RICHARD POTENZA,

*Defendant- Appellant.*

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:22-cr-00472-LSC-GMB-1

————————————————

Before JILL PRYOR, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

After appellant Joshua Potenza was found not guilty of federal criminal charges by reason of insanity, the district court ordered him committed to the custody of the Attorney General of

the United States. He appeals the civil commitment order. He challenges the district court's finding that he failed to establish that his release would not create a substantial risk of bodily injury to another person or serious damage to another person's property due to a present mental disease or defect. After careful review, we affirm.

## I.

Potenza repeatedly left harassing voicemails for victim C.W., his former college roommate and coworker, who lived in Tuscaloosa, Alabama. In a September 2022 voicemail, Potenza threatened to kill C.W., saying he would "cut [his] fucking head off." Doc. 91 at 9.[1] He also threatened to "go after" C.W.'s wife and children. *Id.*

C.W. reported the calls to Tuscaloosa police. He expressed concern about Potenza's mental health. Potenza had said that C.W. and others were plotting against him and accused C.W. of transmitting messages to him through the radio. Potenza also had told friends that he believed magnets were controlling his thoughts.

After an investigation, law enforcement determined that Potenza was in Texas when he left the threatening message for C.W. But, within a few days of leaving the message, Potenza traveled to

---

[1] "Doc." numbers refer to the district court's docket entries.

Tuscaloosa. In Tuscaloosa, he was arrested by local law enforcement.

After the arrest, officers saw Potenza engage in behaviors that suggested he was suffering from a mental illness. He told police that he had killed an individual named D.F., cut the victim's body into pieces, and stored the pieces in his vehicle. None of this was true. In addition, when Potenza spoke with police, he displayed disorganized thinking that suggested he was suffering from mania.

A law enforcement officer brought Potenza to a local hospital, where he was admitted for mental health treatment. At the hospital, Potenza was diagnosed with schizophrenia, paranoid type. He was discharged after more than two months in the hospital.

Based on the threatening September 2022 voicemail to C.W., a federal grand jury charged Potenza with transmitting a threatening communication in violation of 18 U.S.C. § 875(c).[2] He notified the court that he intended to assert an insanity defense.

The court ordered an evaluation to determine whether Potenza was competent to stand trial and to evaluate his mental state at the time of the crime. Potenza, who was in custody at a local prison, was committed to the Attorney General's custody so that he could be evaluated at a Bureau of Prisons facility.

---

[2] The grand jury also charged Potenza with communicating a threat to C.W. in April 2022. But the court later dismissed this charge.

Clinical and forensic psychologist Carmen Rodriguez evaluated Potenza. After interviewing him, administering psychological tests, and reviewing records, she concluded that he was competent to stand trial but was insane at the time of the offense. She diagnosed him with bipolar disorder I. During the evaluation, she observed him exhibit residual manic symptoms such as mild fluctuations in mood and inflated self-esteem, but he did not display delusional beliefs or bizarre behavior. She opined that his stability during the evaluation was likely the result of psychiatric treatment he received after his arrest.

In reaching these conclusions, Rodriguez considered Potenza's background. She noted that he had faced criminal charges in Washington state court for violating an anti-harassment order and a protective order. In that case a psychological examiner determined that he was not competent to stand trial because he was unable to assist in his own defense.

Rodriguez determined that during clinical interviews Potenza minimized his mental health history. He initially denied a history of psychiatric conditions or mental health treatment, aside from being diagnosed with attention deficit hyperactivity disorder (ADHD). He also denied any history of psychiatric hospitalizations. When pressed about the hospitalization in Tuscaloosa, he said that the doctors there told him that they had "no concerns regarding his mental health." Doc. 31 at 6.

Rodriguez also found that during interviews Potenza was unwilling to discuss the conduct that led to the charges in this case.

He declined to review discovery material with her, saying that discussing the material would cause him anxiety. He also said that C.W. had written him messages with intent to cause harm, but he could not provide any examples of the messages. To the extent that Potenza would discuss the incident leading to the charges in this case, Rodriguez found that he had diminished insight into the wrongfulness of his actions, noting that he insisted that his friends and family were harassing or gaslighting him.

Rodriguez ultimately concluded that Potenza's mental illness did not appear to be interfering with his rational understanding of the proceedings or his ability to assist with his defense and that he was competent to stand trial. But she opined that he was insane at the time of the alleged offense because his mental illness precluded him from appreciating the nature, quality, and wrongfulness of his actions.

After Rodriguez submitted her opinions, Potenza was brought back to the Northern District of Alabama for further proceedings. In the criminal case, the parties stipulated that he was competent to proceed. The court entered an order finding him competent to stand trial.

The court then considered his insanity defense. After a bench trial,[3] it found that he proved an insanity defense by clear and convincing evidence. The court directed him to be held in the custody of the United States Marshals Service while the court

---

[3] Potenza waived his right to a jury trial.

assessed his dangerousness and determined whether he should remain in custody going forward. It ordered him to submit to an examination to determine whether his release would create a substantial risk of bodily injury to another person or serious damage to the property of another due to a present mental disease or defect.

A forensic psychiatrist from the Bureau of Prisons attempted to perform this evaluation via video conference. But Potenza's mental state "had significantly decompensated" and the evaluation could not be conducted. Doc. 56 at 1. His attorneys then filed an unopposed motion asking that he be committed to the Attorney General's custody so that mental health professionals with the Bureau of Prisons could stabilize his mental health condition and complete the evaluation. The court granted the motion.

At a Bureau of Prisons facility, a panel assessed Potenza's dangerousness. As part of the assessment, a member of the panel, Dr. Paige Voehringer, interviewed and evaluated him.

During the interview, Voehringer asked Potenza about his mental health history. He denied that he had been formally diagnosed with a mental illness. And he refused to take antipsychotic medication. When she asked him about his guilty plea by reason of insanity, he appeared confused and said that she had incorrect information. He later said that his attorneys had tricked him into the plea. He did, however, discuss with her his symptoms of ADHD and depression. She concluded that he had "no insight" into his psychotic symptoms. Doc. 63 at 8.

Voehringer found that when discussing his history Potenza was generally well-spoken and logical. But when he was asked about the underlying offense, he became irritable. He told her that he had not engaged in threatening behavior. When she asked about his life during 2021 and 2022, he was mostly unwilling to talk about it.

Voehringer diagnosed Potenza with bipolar I disorder, most recent episode manic, with psychotic features. She found that during the evaluation he exhibited "residual manic symptoms" but was not "grossly disorganized" and did not "verbalize active delusional beliefs or bizarre behavior." *Id.* at 9. She opined that his condition was "stable," but cautioned that "the symptoms of bipolar disorder wax and wane." *Id.* She also diagnosed him with narcissistic personality disorder.

Voehringer administered two formalized assessments to evaluate Potenza's risk of violence if he were released. The first assessment, the Psychopathy Checklist Revised, Second Edition (PCL-R), showed that he had "an average risk of recidivism." *Id.* at 11. For the portion of the assessment that measured selfishness, callousness, and remorselessness, he scored higher than 80% of inmates. According to Voehringer, individuals with high scores in this area were "more likely to quit treatment prematurely." *Id.* His total score on the PCL-R assessment was 20, which was higher than the score for 40% of "normal prison inmates." *Id.* According to Voehringer, one study found that 80% of individuals with a score

of at least 19 committed an additional "violent event" within six years of release. *Id.*

The second assessment was the Historical Clinical Risk Management-20, Version 3 (HCR-20-V3). It identified several factors that increased Potenza's overall risk for engaging in future violence. These factors included a history of problems with violence; a history of problems with a major mental disorder; a history of problems with a personality disorder; a history of problems with relationships; a history of problems with treatment or responding to supervision; recent problems with insight; recent problems with treatment; future problems with treatment or responding to supervision; future problems with professional services, personal support, and plans; future problems with a living situation; future problems with personal support; and future problems with stress or coping. The HCR-20-V3 identified other protective factors that decreased Potenza's overall risk for violence including: no history of other antisocial behavior, no history of significant problems with employment, no history of problems with substance use, no history of problems with traumatic experiences, no history of problems with violent attitudes, no recent problems with symptoms of a major mental disorder, and no recent problems with instability.

Voehringer opined that Potenza's unconditional release "create[d] a substantial risk of bodily injury to another person or serious damage to the property of another." *Id.* at 16. She explained that he began experiencing "significant mental problems" in February 2021, and within a year "his symptoms had increased to the

point that he was manic and floridly psychotic." *Id.* at 15. During this period, he repeatedly "left voicemails for a former coworker[], friends, and family members, in which he threatened to harm or kill the recipients." *Id.* She found a "clear link between [] Potenza's history of violence and his mental illness." *Id.*

Voehringer recommended that the court order Potenza civilly committed. Although he was currently stable, she noted that symptoms of bipolar disorder waxed and waned. She concluded that if he were released, he would not have any formal supervision and likely would have a limited ability to arrange for therapy and psychiatric consultation. She also found that he likely would have trouble finding housing and employment, which would increase the possibility that he would "become medication noncompliant and increase his risk of violent behavior." *Id.* She concluded that civil commitment "would allow for the creation of a formal conditional release plan (when appropriate) and supervision in the community which would increase the likelihood of ongoing treatment compliance and minimize his risk of violence." *Id.* at 16. The risk assessment panel agreed and adopted her recommendation.

After the risk assessment panel submitted its decision, a magistrate judge held an evidentiary hearing about whether Potenza should be committed. Voehringer testified at the hearing. She described how she reached her conclusion about Potenza's risk of future dangerousness.

In her testimony, she described the PCL-R and HCR-20-V3 assessments. She explained that each assessment was generally

accepted in the field of forensic psychology. She stated that before evaluating Potenza she had administered the PCL-R approximately five times and the HCR-20-V3 at least 40 times.

Potenza's attorney vigorously cross-examined Voehringer. She had based her opinions on Potenza's dangerousness in part on his unwillingness to receive treatment for his mental health disorders. She admitted on cross examination that she never told him that she had diagnosed him with bipolar disorder, reviewed what symptoms or behaviors caused her to reach this conclusion, or described what treatment was necessary to address the symptoms. She also admitted that his condition had been stable the entire time that he was in custody after his arrest and that he never engaged in any violence even when he was attacked by other inmates. She further testified that she was unaware of his threatening anyone during the 19 months when he had been in custody and also acknowledged that he had not taken any medication to treat his bipolar disorder during this period.

Potenza's attorney urged the magistrate judge to recommend Potenza's release. Although Potenza had made threats in the past, his attorney emphasized that he had never acted on the threats and had no history of causing bodily injury to anyone. She also pointed out that Potenza had spent the past 19 months in custody, during which he had been moved among 20 different jails. Despite this stressful experience, he had neither engaged in any physical harm nor threatened anyone.

His attorney also addressed the psychological assessments Voehringer used. Although the HCR-20-V3 assessment purported to measure a person's likelihood to commit future acts of violence, it treated making a verbal threat without causing bodily injury as an act of violence. The attorney argued that the court should give this assessment limited weight because, in deciding whether to commit Potenza, the court had to predict his likelihood of engaging in a narrower category of conduct: an act that caused a substantial risk of bodily injury or property damage. And she asserted that Potenza's PCL-R score was in a range that indicated he did not have a substantial risk of reoffending.

After the hearing, the magistrate judge recommended that the court order Potenza to remain civilly committed. The judge explained that, under federal law, a defendant found not guilty by reason of insanity is committed to a suitable facility until he is eligible for release. 18 U.S.C. § 4243(a). To be eligible for release, Potenza had to establish by a preponderance of the evidence that his release "would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect." *Id.* § 4243(e).

The magistrate judge found that Potenza failed to carry this burden. He relied on Voehringer's testimony, which he found credible. In his recommendation, the judge discussed both the PCL-R and HCR-20-V3 assessments.

Although Potenza was not "in an acute bipolar episode at present," the magistrate judge agreed with Voehringer's

assessment of the link between his history of violence and his mental illness. Doc. 68 at 5. The judge found that "Potenza would benefit from the structure provided by continued hospitalization in a Bureau of Prisons' facility until he and his psychologists develop a suitable structured release plan." *Id.* The magistrate judge credited Voehringer's opinion that if Potenza were immediately released, he would have difficulty arranging for psychiatric services and finding an appropriate living situation and employment, which would increase the risk that he would become medication noncompliant and engage in violent behavior. According to the magistrate judge, these were risks that "the court cannot accept." *Id.* at 6. He thus recommended that the district court order Potenza committed to the Attorney General's custody.

Potenza objected to the recommendation. The district court, after a *de novo* review, adopted the magistrate judge's recommendation and ordered Potenza committed to the Attorney General's custody.

This is Potenza's appeal.

## II.

We review for clear error a district court's dangerousness determination under 18 U.S.C. § 4243. *United States v. Wattleton*, 296 F.3d 1184, 1201 n.34 (11th Cir. 2002). We also review for clear error a district court's determination whether a defendant is suffering from a present mental disease or defect. *United States v. McIntosh*, 900 F.3d 1301, 1307 (11th Cir. 2018).

Clear error is a deferential standard of review. *Id.* We may find clear error only when we are left with a definite and firm conviction that the district court's finding of fact was a mistake. *Id.* When the district court's findings are plausible considering the entirety of the record, its determination is not clearly erroneous. *Id.* We may not reverse a district court's factual findings "simply because we would have weighed the evidence differently." *Id.* (citation modified).

## III.

Congress has established a framework for the civil commitment of defendants in federal criminal cases who are found not guilty by reason of insanity. *See* 18 U.S.C. § 4243; *Shannon v. United States*, 512 U.S. 573, 577 (1994) (describing statutory scheme). In this section, we begin by reviewing this statutory scheme. We then turn to Potenza's challenge to his commitment.

## A.

Congress has created an intricate scheme governing civil commitment for individuals found not guilty by reason of insanity in federal criminal cases. After being found not guilty by reason of insanity, the defendant must be committed to a suitable facility pending a hearing to determine whether he is eligible for release or subject to civil commitment. *See* 18 U.S.C. § 4243(c); *Wattleton,*

296 F.3d at 1197. In general, a court must hold this hearing within 40 days of the insanity verdict.[4] *See* 18 U.S.C. § 4243(c).

At the hearing to decide whether a defendant will be civilly committed, a court asks whether the defendant's release would "create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect." *Id.* § 4243(d). For purposes of this inquiry, "the phrase mental disease or defect is a legal term that must be construed and applied by the district court to the specific facts of each case, rather than a clinical term to be decided by medical professionals." *McIntosh*, 900 F.3d at 1308.

Before the hearing, the defendant must undergo a psychiatric or psychological exam, and a report of the examination must be filed with the court. 18 U.S.C. §§ 4243(b). The report must include the defendant's "history and present symptoms"; a description of any "psychiatric, psychological, and medical tests that were employed and their results"; the examiner's findings; and the examiner's opinions as to diagnosis, prognosis, and "whether the person is suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another." *Id.* § 4247(c).

---

[4] Here, the parties agreed to extend the deadline. *See* 18 U.S.C. § 4247(b) (permitting a court to extend the deadline for a § 4243 hearing "upon a showing of good cause").

To secure his release, the defendant must prove by a "preponderance of the evidence" that his release would not create a substantial risk of bodily injury to another person or serious damage to the property of another person.[5] *Id.* § 4243(d). If the court finds that the defendant failed to carry his burden, it must commit him to the custody of the Attorney General of the United States. *Id.* §§ 4243(e); 4247(i). When a defendant is committed to the Attorney General's custody, he must be hospitalized "for treatment in a suitable facility." *Id.* § 4243(e).

A defendant who is ordered civilly committed receives periodic reviews of his confinement. *See id.* § 4247(e). The director of the facility where he is committed must submit an annual report to the court regarding the defendant's mental condition and a recommendation concerning his need for continued confinement. *Id.* § 4247(e)(1)(B). If the director determines that the defendant "has recovered from his mental disease or defect to such an extent that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment, would no longer create a substantial risk of bodily injury to another person or serious damage to property of another," she must notify the

---

[5] If the defendant's previous offense "involv[ed] bodily injury to, or serious damage to the property of, another, or involv[ed] a substantial risk of such injury or damage," he must meet a more demanding standard and show by "clear and convincing evidence" that his release would not create a substantial risk of bodily injury to another person or serious property damage. 18 U.S.C. § 4243(d). The government does not contend that Potenza had to meet this higher standard.

court that ordered the commitment. *Id.* § 4243(f). The court then orders the defendant's discharge or holds a hearing to determine whether he should be released. *Id.* In addition, a defendant or his legal guardian may file a motion seeking a discharge.[6] *Id.* § 4247(h).

If, after a hearing, the court finds that the defendant has carried his burden to show that his release "would no longer create a substantial risk of bodily injury to another person or serious damage to property of another," it shall order that he be "immediately discharged." *Id.* § 4243(f)(1). Alternatively, the court may order a "conditional release," which requires the defendant, upon release, to follow "a prescribed regimen of medical, psychiatric, or psychological care or treatment." *Id.* § 4243(f)(2). If a defendant on a conditional release fails to comply with the ordered regimen of care, he may be arrested and, after a hearing, ordered "remanded to a suitable facility" if the court finds that "his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." *Id.* § 4243(g). When a defendant is on conditional release, the court, after a hearing, may modify or eliminate any of the conditions. *Id.* § 4243(f).

## B.

With this understanding of the statutory scheme governing civil commitment in mind, we now turn to Potenza's challenge to the district court's commitment decision. He argues that the

---

[6] This motion may be filed "at any time" so long as it is filed more than 180 days after the court's most recent determination that the defendant should continue to be committed. 18 U.S.C. § 4247(h).

district court clearly erred in finding that he failed to show by a preponderance of the evidence that his release would not create a substantial risk of bodily injury to another person or serious damage to property of another due to a mental disease or defect.

In reviewing the district court's assessment of Potenza's dangerousness, we keep in mind that § 4243 "does not provide a checklist of factors a court shall consider in assessing the dangerousness" of a defendant found not guilty by reason of insanity. *Wattleton*, 296 F.3d at 1201. Instead, the court must consider any factor that "relate[s] to the risk of danger caused by a present mental disease or defect." *Id.* In deciding whether a defendant carried his burden, a district court may rely upon, among other things, risk assessment panel reports and psychologist testimony. *See McIntosh*, 900 F.3d at 1309. The court also may consider whether the defendant would lack support if he were released and any risks stemming from the lack of such support. *See Wattleton*, 296 F.3d at 1201–02.

The district court did not clearly err in finding that Potenza failed to carry his burden that his release would not create a substantial risk of bodily injury or serious property damage to another person. This finding was plausible based on the record, which included Voehringer's opinions as well as the evidence that Potenza refused to acknowledge his mental disorders. In making the dangerousness assessment, the court also was permitted to consider that if Potenza were immediately released, he would experience a lack of stability that would increase the risk of violent behavior. *See Wattleton*, 296 F.3d at 1201–02 (recognizing that district court could

consider lack of support if defendant was immediately released when assessing risk of dangerousness).

Potenza nevertheless argues that the district court erred in assessing his dangerousness because his previous "conduct involved only verbal threats." Appellant's Br. 28. He says that given this history, the district court had no basis to find that he posed a substantial risk of causing bodily injury or property damage to another. We disagree. The record contains ample evidence that Potenza had a history of disruptive behavior that attracted the attention of law enforcement, including making violent threats and violating protective orders. Based on this evidence, along with Potenza's resistance to treatment, the district court reasonably could infer that if Potenza were released, his behavior would escalate and pose a risk of harm to others.

In attacking the district court's dangerousness assessment, Potenza also challenges the court's reliance on Voehringer's opinions. He says that the district court should have given the opinions no weight because of her limited experience. When she assessed Potenza, Voehringer had been a psychologist for four years and rendered the PCL-R risk assessment five times. In addition, he criticizes her opinions because she did not contact his family members regarding a release plan and support system. Although he has arguments about why a factfinder could have decided to give Voehringer's opinions less weight, we cannot say that the district court clearly erred in concluding otherwise. We are not left with a

definite and firm conviction that the district court made a mistake in relying on Voehringer's opinions. *See McIntosh*, 900 F.3d at 1307.

Potenza also criticizes the risk assessment tests that Voehringer used. He asserts that "risk of violence is difficult to predict" and that Voehringer's tests were a poor fit to assess his risk of future dangerousness. Appellant's Br. 20. He points out that the HCR-20-V3 test predicts a defendant's risk of engaging in various types of violent conduct, including making threats without causing someone else bodily injury, yet the court cannot consider a defendant's risk of engaging in such conduct when deciding whether to order civil commitment under § 4243(d).

Even though predicting a person's future dangerousness is difficult, Congress has created a statutory scheme that requires the court to make such an assessment when deciding whether to release a defendant who was found not guilty by reason of insanity. *See* 18 U.S.C. § 4243(d). And although the HCR-20-V3 test is not a perfect fit for predicting a defendant's likelihood of engaging in conduct that creates a substantial risk of bodily injury or serious damage to the property of another, the district court did not clearly err when it considered the test's results.

Besides challenging the district court's finding about his risk of future dangerousness, Potenza also attacks the district court's finding that he remained under a mental disease or defect when he was civilly committed. He says that there is "no evidence" that he continued to suffer from a mental disease or defect because Voehringer's evaluation showed that his "mental health

symptoms" were "in remission" and he was "between mood episodes." Appellant's Br. 24–25 (citation modified).

Again, we cannot say that the district court clearly erred. The record amply supports the finding that Potenza suffers from bipolar disorder and narcissistic personality disorder, even if his condition was stable while he was in custody and living in a highly structured environment. Notably, he has identified no caselaw holding that a district court erred in finding that a defendant who was found not guilty by reason of insanity was under a present mental disease or defect when his underlying medical condition was episodic in nature, like bipolar disorder.

For the above reasons, we conclude that the district court did not clearly err in finding that Potenza failed to carry his burden to show that he was entitled to release. Of course, notwithstanding our decision, the director of the facility where Potenza is committed must review annually whether he needs continued confinement and to submit copies of such reports to the district court. *See* 18 U.S.C. § 4243(e). Importantly, if the director determines that Potenza's release or conditional release no longer creates a risk to others, the director must promptly notify the court to review whether Potenza should be released. *Id.* § 4243(f). In addition, regardless of the facility director's decision, our decision does not bar Potenza from filing, through his attorney, a future motion in the district court seeking his full release or conditional release. *See id.* § 4247(h).

**AFFIRMED.**